**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Kenneth A. Mielke and Janet Mielke,** **Civil No. 00-1617 (SRN)**

**Plaintiffs,**

**v.**

**ORDER**

**Boart Longyear Company,**

**Defendant, and**
**Third-Party Plaintiff,**

**v.**

**Highway Services, Inc.,**

**Third Party Defendant.**

---

Timothy P. Jung, Esq., on behalf of Plaintiffs.

Scott P. Drawe, Esq., on behalf of Defendant and Third-Party Plaintiff.

Neal J. Robinson, Esq., on behalf of Third-Party Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on November 15, 2001, on Defendant's Motion for Sanctions, to Exclude the Testimony of Plaintiffs' Experts, and for Summary Judgment (Doc. No. 24). Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties waived their right to proceed before a United States District Judge, and voluntarily consented to have all proceedings in this case, including the entry of judgment, conducted and determined by the undersigned United States Magistrate Judge. It was so ordered by the Honorable Michael J. Davis, Judge for the

FILED JAN 1 5 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

United States District Court for the District of Minnesota.

This Order addresses that motion.

## I. DEFENDANT'S MOTION FOR SANCTIONS, TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERTS AND FOR SUMMARY JUDGMENT.

### A. Factual Background.

#### 1. Accident.

On June 12, 1997, Plaintiff Kenneth Mielke was employed by Third-Party Defendant Highway Services. (Compl. ¶ 9.) On that date, Plaintiff sustained severe personal injuries while operating a concrete grinding machine referred to as a PC-5000, on an interstate highway in the state of Washington. (Compl. ¶ ¶ 10 &11.) The PC-5000, which is manufactured by Defendant Boart Longyear Corp., has concrete cutter heads, or blades, which operate in a direction opposite to the direction in which the PC-5000 travels. Exh. L, Affidavit of Timothy P. Jung (Jung Aff.). The operator's manual states, "[i]n the case of drive system failure, or if the traction unit is raised with the turning blade shaft in contact with the pavement, the machine could lurch backward without warning, driven by the rotating blades." Id. On June 12, 1997, Plaintiff Kenneth Mielke was operating the PC-5000 on an uphill grade of approximately 6%. Exh. E, Jung Aff. At some point, the PC-5000 reversed direction, and began to move down hill. Id. At this time, Plaintiff was not on the operating platform, but instead was walking near or next to the machine. Id. In an effort to prevent the machine from rolling downhill, Plaintiff grabbed for the steering wheel. Id. Plaintiff did prevent the machine from continuing downhill by steering it into a nearby guardrail. Id. In the process, however, he was pulled under the machine, and his right leg was so severely damaged that it was eventually amputated at the knee. Id.

Following the accident, the State of Washington Department of Labor and Industry (WISHA) conducted an investigation. Id. Pursuant to the investigation, photographs were taken of many of the component parts from the PC-5000 drive system, including, the drive shaft, universal joints, shank, and U-bolts. After examining parts and conducting interviews, David Puente, Jr., a WISHA investigator, determined that the accident resulted from a yoke in the drive system breaking off. Id. Puente concluded that the yoke breaking off was "a single and unforeseen incident." Id.

At approximately the same time that the investigation was being conducted, Third-Party Defendant notified Defendant of the accident. Affidavit of William Holmes (Holmes Aff.). William Holmes, Manager of Engineering for Defendant, requested that Third-Party Defendant preserve the drive system for examination. Id. On July 21, 1997, when Holmes arrived to examine the drive system, however, he was informed that Third-Party Defendant had thrown out the broken components. Id. Thus, Defendant was not able to examine any of the parts.

The only component part which has been preserved in this case, is the flange from the transmission end of the drive system. In the 19 months between the accident and when this part was examined, however, it became completely rusted.

**2. Expert Reports.**

Plaintiffs retained two experts, John E. Brynildson and Arthur F. Sholl, who opined that the PC-5000 drive system was defectively designed. Brynildson is a consulting engineer in metallurgical and material technology, who has extensive experience in ductile iron, metal

melting and casting, thermo-processing and chemical and mechanical analysis[1]. In his preliminary report, Brynildson was given a fractured portion of the universal joint that had failed, but no other component parts of the drive system. Brynildson observed that the part he was given was heavily oxidized (rusted) at the time he examined it. In addition, Brynildson was furnished with components of universal joints used on PC-5000s generally (exemplars). He compared the exemplars of the universal joints used in the PC-5000 at the time of the accident with exemplars of the universal joints currently used in PC-5000s. He determined that the universal joints used at the time of the accident were made of ductile iron. Brynildson then performed hardness measurements for the ductile iron. Based on his examination, testing, experience as a metallurgical engineer, and experience specifically examining failed power transmission devices and heavy equipment operations, Brynildson offered the following opinion:

> It is my opinion, to a reasonable degree of engineering certainty, that the u-joint used at the time of Mr. Mielke's accident was not adequately sized and was made of a material more susceptible to fatigue failure and brittle fracture than one made of steel. A steel forging or casting would be a proper choice as compared to ductile iron. The fact that the part is welded to a spline shaft also has problem potentials as ductile iron has a high carbon content and during resolidification after welding hard and brittle iron carbides can form. This probability is minimal with a steel part. Ductile iron is more susceptible to deviations in process control than steel so a manufacturing defect can manifest itself more readily.

During his deposition, Brynildson admitted that he had done no testing of an actual PC-5000 drive system. (Brynildson Depo. 42.) He further conceded that such testing would be useful for measuring what the actual impact on drive-system parts would be, and for determining

[1]All of Brynildson's professional qualifications and the details of his preliminary report, as recorded in this Order, are based on information contained in Exh. A, Jung Aff.

the resulting fatigue. Id. at 42-43.) Brynildson also stated that he had done no study of the degree to which the depth of cut by the machine affects the force that is being transmitted to the drive system. Id. at 54-56. He was not aware of the application of the load for the PC-5000, or of the maximum torque to which the drive system was subjected. Id. at 67-68 & 76. Finally, Brynildson stated that he could not say what caused the drive-system failure. Id. at 92-93.

After his deposition, Brynildson was furnished with the WISHA report and photographs. He then compiled a supplemental report.[2] Based on photographs of the U-bolts, Brynildson made the following observations and determination:

> Several of the U-bolts clearly display an elongated distortion and also show that the locking nuts were still tightened. The elongated distortion would not be present if these had been loose as alleged by defense counsel. The pattern of distortion would have been in a rotational mode rather than the configuration shown in the photographs. This demonstrates that these U-bolts were not loose before the accident.

Brynildson also opined that "the ductile iron flange yoke failed first and the subsequent rotational force of the drive wheel going in reverse as well as the engagement of the machine into the loose gravel and earth caused the U-bolts to be deformed until the cross was pulled away from the yoke." He then reiterated his opinion from the preliminary report that "[t]he choice of ductile iron for the flange yoke with the section thickness that the subject yoke had was not a proper one for this application."

Sholl specializes in engineering design and structural inspections. He was previously employed as a director of engineering, who was responsible for the development and production

---

[2]All of the underlying facts for Brynildson's supplemental report are contained in Exh. B, Jung Aff.

of construction equipment.[3] Like Brynildson, Sholl performed no direct testing of an actual PC-5000 drive system. Nevertheless, he offered the following opinion:

> Based upon the available information, photographs, deposition transcripts and product literature, certain opinions can be generated to a reasonable degree of engineering certainty. It appears the accident was caused by the failure of the drive shaft, which supplies power to the hydraulic pump and provides the propelling force for the machine. It is evident that the drive shaft and the attaching components were not capable of withstanding the stress induced by the shock loads caused by the grinding operation.

Sholl also offered an opinion concerning additional safety devices with which he believed the PC-5000 should have been equipped. He stated that "[t]he unit should have been equipped with an emergency stop which would instantly terminate the grinding wheel rotation." He emphasized that a "clutch type arrangement" would be ideal, because simply shutting down the engine would take a longer time to halt the PC-5000's movement. Sholl explained that the brake alone would also not be adequate to stop the backward movement, because of the amount of momentum the machine would generate.

Sholl further proposed that "[i]f the manufacturer says that the operator must remain in the seat at the work platform, then the seat should activate a brake so that no operation can proceed unless he is correctly positioned. This would be a similar situation to people with jobs such as forklift operators or locomotive engineers." Sholl then considered the possibility that it might actually be necessary for the operator to exit the platform and complete tasks while the PC-5000 was operating. He determined that the manufacturer "did not address this issue in the operator's manual provided. . . . The manufacturer failed to take reasonable steps to address the

---

[3]All of Sholl's professional qualifications and the details of his preliminary report are based on information contained in Exh. C, Jung Aff.

known and foreseeable issue of operation of the product while off the operator's platform." He also noted that a remote control emergency shutdown switch could also have been incorporated into the PC-5000, but was not. Further, he observed that the operating platform lacked any safety belt or restraining system to ensure that the operator would not be thrown from it in the event that the PC-5000 suddenly lurched backward. He concluded by stating, "[t]he design issues identified above were causative factors in the accident."

During his deposition, Sholl admitted that he had never actually seen the PC-5000 operate. (Sholl Depo. 85.) He also stated that he had not determined just how the clutch device he hypothesized would work, or whether it would require the simultaneous shutting down of other engine functions, and activation of the brakes. Id. at 85-91 & 114-15. He also conceded that he had not conducted any analysis of possible problems with his proposed emergency shutdown switch. Id. at 94-95. Sholl also did not form an opinion about whether the shutdown switch would need to be permanently attached to the control panel, so that the operator would have to remain there at all times, or instead, a remote control switch allowing the operator to walk beside the machine would be sufficient. Id. at 95-104 ,107-08, 111, & 122. And finally, Sholl agreed that he was not aware of how the switches that actually were on the control panel at the time of the accident functioned. Id. at 104-07.

Sholl also supplemented his report after analyzing the WISHA photographs and consulting the Spicer literature,[4] to determine the recommended size for drive-system

---

[4] *Spicer Life Driveline Components: Condensed Specifications* is a widely-used reference guide for determining the appropriate strength and size of component parts for specific machine tasks.

components in this instance.[5] Sholl observed from the photographs, that "it can be seen that the U-Bolt connecting the drive shaft to the drive has failed. Calculations were made to determine what torque would be in the drive shaft to exceed the elastic limit of the U-Bolt. The drive shaft assembly was stated to be a Spicer 1310 series." Sholl then further detailed the forces applied as a result of grinding at a 6% incline, and the resulting tensions. He observed that the Spicer literature stated that any vehicle in such a position "should use U-joints in the 1480 to 1950 series." Sholl then provided a final opinion on the drive-system failure: "Both ends of the drive shaft failed, the U-bolts on one end and the yoke on the other. At this time we are not certain which occurred first but realize that the failure was due to an inadequate factor of safety. This PC 5000 should have employed a U-joint series of the recommended size for a 50,000 lb. vehicle."

**B. Discussion.**

**1. Spoliation of Evidence.**

A court's authority to impose sanctions derives both from Federal Rule of Civil Procedure 37 and from the Court's inherent power to regulate litigation. See Capellupo v. FMC Corp., 126 F.R.D. 545, 550-52 (D. Minn. 1989); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D. N.Y. 1991). "It is well settled that the Court has the inherent power to sanction a party that destroys relevant and discoverable evidence." Shamis v. Ambassador Factors Corp., 34 F.Supp.2d 879, 888 (S.D. N.Y. 1999). "[T]he destruction of evidence that a party knew or should have known was relevant to imminent litigation certainly justifies a

[5] All of the underlying facts for Sholl's supplemental report are contained in Exh. D, Jung Aff.

sanction under the court's inherent power comparable to Rule 37 sanctions." Dillon v. Nissan Motor Co., Ltd., 986 F.2d 263, 267 (8th Cir. 1993).

"Before a sanction for destruction of the evidence is appropriate, however, there must be a finding that the destruction prejudiced the opposing party." Id. The key considerations when determining whether to bar evidence are,

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

Schmid v. Milwaukee Electric Tool Corp., 13 F.3d 76, 79 (3rd Cir. 1994) citing Dillon, 986 F.2d 263; S.D.I. Operating Partnership, L.B. v. Neuwirth, 973 F.2d 652 (8th Cir. 1992). "Finally, whether the extent of a sanction is appropriate is a question peculiarly committed to the district court." Id. at 268 citing Frumkin v. Mayo Clinic, 965 F.2d 620, 626-27 (8th Cir. 1992).

Defendant asserts that it has been prejudiced by the destruction of evidence, specifically the U-Bolts from the drive system. Consequently, Defendant requests that the Court: (1) dismiss Plaintiff's claims based on alleged defects in the drive system; and (2) hold that the sole direct cause of the drive system failure was negligent maintenance by Third-Party Defendant. It explains that the failure to preserve the flange and the loss of the U-bolts has resulted in prejudice both to its defense against Plaintiffs' claims and to its assertion that negligent maintenance by Third-Party Defendant was the sole cause of the accident. The only clear evidence of negligent maintenance, according to Defendant, would be the U-Bolts. Defendant explains that its own experts and Brynildson both agree that if the U-Bolts had been properly fastened, as part of proper maintenance, there would not have been sufficient forces exerted on

them to cause them to fail. If, on the other hand, the U-Bolts did fail, according to Defendant, that could only have been because they were not adequately tightened. Thus, if the U-bolts had been preserved in this case, it would have been possible to examine them and determine whether the accident resulted from improper maintenance. Because the U-Bolts were not preserved, Defendant is prevented from adequately developing its defense.

Defendant concedes that it was Third-Party Defendant rather than Plaintiff who allowed the evidence to be destroyed. Nevertheless, Defendant cites cases such as Himes v. Woodings-Verona Tool Works, Inc., 565 N.W.2d 469 (Minn. Ct. App. 1997) for the proposition that non-parties' actions in spoiling evidence can still justify sanctions. Further, Defendant states that Plaintiffs will not be severely prejudiced by the dismissal of their claims based on defects in the drive system, because they will still be able to pursue claims against Defendant based on the theory that it should have equipped the PC-5000 with an emergency-shut-off switch.

Plaintiffs respond that no sanctions are appropriate in the present case. They maintain that they have suffered similar prejudice to Defendant. The loss of component parts from the drive system, Plaintiffs assert, deprives them of important evidence for demonstrating that the drive system was inadequately small or otherwise defective. Plaintiffs further emphasize that they were not the parties who destroyed the evidence. Rather, the PC-5000 and its component parts were never in Plaintiff's possession after the accident. Third-Party Defendant maintained possession of the parts at all times. Further, Plaintiffs state that when WISHA concluded its investigation and determined that it was not at fault, Third-Party Defendant had no reason to believe there would be a need to preserve these parts.

Third-Party Defendant also responds that the sanctions Defendant seek are inappropriate.

It states that it can find "no case in which a Court has sanctioned a party in order to make them negligent as a matter of law." It explains that it did maintain the flange, and the subsequent rusting was not its fault.

With respect to the rest of the parts, Third-Party Defendant explains that it acted entirely reasonably. It explains,

> Highway Services did not seek the advice of a lawyer, nor did they raise any legal claims against any party. It is believed that after the accident, James Stein, the shop superintendent of Highway Services, had the drive system part(s) recovered from the subject highway grinder and shipped to Highway Services. Affidavit of Gary Arnold, pr. 1. It is also believed that in the fall of 1997, any and all drives system part(s) were released by James Stein to Ronald Esch of Liberty Mutual Insurance Company and/ or Crane Engineering. Id. James Stein is now deceased.

Thus, while Third-Party Defendant can no longer locate the parts, it maintains that it neither knew, nor should have known that they should have been maintained. Further, Mr. Stein's death prevented it from further tracing what has since become of the parts.

Like Plaintiffs, Third-Party Defendant asserts that all parties suffer equally from the loss of evidence, because they all have a stake in determining the cause of failure of the drive system. Moreover, Third-Party Defendant notes that all parties now have equal access to the WISHA photographs of the drive system. Consequently, Third-Party Defendant concludes that the Court should not impose sanctions.

The Court denies Defendant's motion. In virtually every case Defendant cites in support of its motion, the offending party gained a significant tactical advantage over the opposing party, because it had already examined the evidence before it was lost or destroyed. See e.g. Patton v. Newmar Corp., 538 N.W.2d 116 (Minn. 1995); Dillon, 986 F.2d at 269; Bachmeier v. Wallwork

Truck Centers, 544 N.W.2d 122 (N.D. 1996). Defendant in the present case is not in a similarly disadvantageous situation. Plaintiffs have not had the opportunity to examine the actual drive system in order to develop an argument for causation, and Third-Party Defendant has not had the opportunity to examine the parts to defend against the claim of inadequate maintenance. Hence, the sanctions applied in the above-cited cases are not necessary here to protect Defendant from an unfair disadvantage.

Further, Schmid and Dillon illustrate that the Court must also consider the degree of fault of the party who destroyed the evidence. This factor clearly separates the present case from Marrocco v. General Motors Corp., 966 F.2d 220, 223 (7th Cir. 1992), in which, according to Defendant, identical sanctions were applied to those urged here. In Marrocco, plaintiffs knowingly violated a protective order by examining an automobile without the defendant being present, and inadvertently destroying evidence. Id. at 221. In the present case, Plaintiffs committed no such inappropriate act. Furthermore, the parts were never in Plaintiffs' possession or control, a relevant fact when a court decides whether or not to impose sanctions. See Bachmeier v. Wallwork Truck Centers, 507 N.W.2d 527, 534 (N.D. 1993) citing Dinello. v. General Motors Corp., 1993 WL 407684 (Conn. Super.).

With respect to Third-Party Defendant, the Court does not find that its behavior was nearly as inappropriate as the direct violation of a court order in Marrocco. In retrospect it is clear that the drive system components were important evidence. But that was not necessarily clear at the time, when WISHA had determined there was no wrongdoing, and no lawsuit was yet pending. As the court in Schmid observed,

> An across-the-board rule that would require the identification of all potential defendants at this nascent stage of the potential

> controversy and an invitation to each of them to attend an exploratory investigation would be inefficient, if not altogether unworkable. Many accident investigations do not lead to litigation and many narrow the field of potential defendants.

13 F.3d at 81. The Court acknowledges that Defendant promptly attempted to gain access to the relevant component parts, and that Third-Party Defendant, in effect, prevented that access. However, litigation was not pending or imminent at that time, and more importantly, the loss of evidence in this case has prejudiced all parties equally. Consequently, the Court can not justify dismissing Plaintiff's claims based on alleged defects in the drive system, or holding that the sole direct cause of the drive system failure was negligent maintenance by Third-Party Defendant. Therefore, Defendant's motion is denied with respect to sanctions.

**C. Summary Judgment.**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. v. Zenith Radio, 475 U.S. 574, 587 (1986) quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

> The nonmoving party may not, however, "rest on mere allegations or denials" but must demonstrate on the record the existence of specific facts which create a genuine issue for trial. Fed R. Civ. P. 56(e). Such an issue exists and summary judgment must be denied

> if on the record then before it the court determines that there will be sufficient evidence for a jury to return a verdict in favor of the nonmoving party.

Krenik v. County of Le Sueur, 47 F.3d 953, 957 quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**1. Exclusion of Expert Testimony.**

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. "When evaluating the admissibility of expert testimony under Federal Rule of Evidence 702, the district court must look to both the relevancy and the reliability of the testimony." Blue Dane Simmental v. American Simmental Ass'n, 178 F.3d 1035, 1040 (8th Cir. 1999) citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

"We conclude that *Daubert's* general holding-setting forth the trial judge's general "gatekeeping" obligation–applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge." Kumho 526 U.S. at 141. The Eighth Circuit has articulated Daubert as follows,

> The Court suggested that, in its attempt to determine whether proffered scientific evidence is scientifically valid, a trial court should ordinarily consider, among other factors, the following: (1) whether the underlying theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a known or knowable rate of error; (4) whether the theory or technique is generally accepted in the relevant community. This list of factors is not exclusive, and the trial court is left with great flexibility in adapting its analysis to fit the facts of each case. The

> polestar, however, must always be "scientific validity–and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission."

Jaurequi v. Carter Mfg. Co. Inc., 173 F.3d 1076, 1082 (8th Cir. 1999) (internal citations omitted) citing Daubert 509 U.S. at 593-95.

Defendant asserts that the Court should exclude Brynildson and Sholl's testimony, because it does not meet the requirements of Daubert. It explains that, "Brynildson conducted no analysis of the load requirements or the specifications of the drive system. He performed no testing in support of his opinions. He did not determine the cause of the failure. In short, Brynildson did nothing more than pronounce himself an expert and state his opinions."

With respect to Sholl, Defendant states, "Sholl performed no analysis of any sort regarding the drive shaft. His opinions regarding the emergency stop switch are so totally devoid of reasoned analysis that he could not identify the features or location of the switch. He did not even know the function or location of the shutdown switches on the PC5000."

Plaintiffs respond that their experts' opinions do satisfy the Daubert requirements and should not be excluded. With respect to Brynildson, Plaintiffs explain that he took into account relevant factors such as the weight of the PC-5000 when fully loaded, the relevant forces it would apply, and the photographic evidence of damage to the drive system. Brynildson, according to Plaintiffs, was able to determine the manner in which the different component parts fractured, and conclude from that the drive system was inadequately small to support the load.

Plaintiffs make much the same argument in defense of Sholl, but add that Sholl analyzed the Spicer literature regarding recommended uses of the drive shaft assembly. Plaintiffs conclude that "[t]he opinions of Sholl and Brynildson are based upon long-accepted engineering

principles."

**2. Design Defect.**

With respect to the issue of defective design, the Court denies Defendant's motion to exclude expert opinions based on Daubert. The Court acknowledges that neither Brynildson nor Sholl ever conducted direct testing of the PC-5000. Moreover, Brynildson clearly was never aware of the machine's actual load applications, and, consequently, he could not state with any precision the exact forces that were being exerted on the drive-system components. These shortcomings significantly weaken their opinions, and may well detract from the weight the jury chooses to give to their testimony. But they do not render the opinions scientifically invalid. And under Daubert, the polestar, "must always be scientific validity." See Jaurequi, 173 F.3d at 1082, quoting Daubert 509 U.S. at 594-95.

In the present case, Brynildson testified based on his extensive experience in metallurgy. His previous work clearly educated him on the qualities of ductile iron, including its relative strength and resistance to particular stresses and fatigue. His knowledge is based on scientifically accepted methods of testing iron and other metals' behavior under varying conditions. He is able to conclude that the U-Bolts were not improperly fastened, because of their elongated distortion, and by noting that the locking nuts were still tightened. This conclusion is clearly based on a developed understanding of how the different components interact. Defendant is incorrect to state that this opinion lacks any semblance of scientific method. Brynildson clearly has certain hypotheses that he has developed from his experience in this field. And whether he is right or wrong, Brynildson's conclusion is based on legitimate analysis of the evidence that was supplied to him.

With respect to the drive-system failure, Sholl's method is also sufficiently valid to satisfy Daubert. He reasons in much the same way as Brynildson. Further, after consulting the Spicer literature, Sholl's analysis is significantly more detailed. He is able to estimate the actual forces that were exerted by the PC-5000 as it proceeded up the 6% incline. This reasoning is based on Spicer literature that is apparently widely accepted in its community. Moreover, Defendant does not challenge the accuracy of the calculations themselves. Finally, Sholl fully documented his calculations and stated that they are consistent with generally accepted engineering principles.

With respect to the emergency shutdown switch, Sholl identified each of the possible functions this switch would serve, and the reasons why these would be important. Moreover, he stated that he had designed such switches himself in the past. (Sholl Depo. at 86-87.) Sholl explained that a single switch would be superior to the multiple switches in the PC-5000 involved in the incident, because there is not time in an emergency to decide which parts of the machine to shut down. Id. at 93. Further, he referenced other machines, such as those manufactured by Wirtgen, that contain one form of the safety switch he proposed. Id. at 108. Lastly, he stated that the remote control switch would have been feasible in 1984, when the PC-5000 involved was manufactured. Id at 92.

The testimony indicates that an emergency shutdown switch has previously been designed, documented, and put into practice. Certain manufacturers' choice to employ such a switch also demonstrates that there is some acceptance of its usefulness in the community. Hence, the testimony satisfies multiple Daubert factors.

Finally, the Court takes seriously the observation that "[o]ne very significant fact to be

considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." Daubert v. Merrell Dow Pharmaceuticals, Inc. (on Remand) 43 F.3d 1311, 1317 (9th Cir. 1995). Both Brynildson and Sholl's opinions grow naturally out of the research they have conducted as part of their professions. This further supports the conclusion that their testimony is admissible under Daubert.

**3. Causation.**

Viewing the facts of the incident and Sholl's testimony in the light most favorable to Plaintiffs, the Court finds that they have demonstrated that there is a genuine issue of material fact concerning whether an emergency shutdown switch could have prevented Plaintiff's injuries. Moreover, Sholl testified that he had designed such switches in the past, and that they were feasible at the time the PC-5000 was manufactured. Consequently, summary judgment is not appropriate with respect to this claim. See Long v. Cottrell, Inc., 265 F.3d, 663, 669 (8th Cir. 2001); see also Minnesota Practice, CIV. JIG 75.20.

With respect to defects in the drive system, Plaintiffs' expert testimony may not have adequately demonstrated causation. This shortcoming exists independent of any Daubert concerns. Brynildson stated "the u-joint used at the time of Mr. Mielke's accident was not adequately sized and was made of a material more susceptible to fatigue failure and brittle fracture than one made of steel. A steel forging or casting would be a proper choice as compared to the ductile iron." While there is nothing inherently incorrect about this conclusion, it still does not demonstrate that had a steel forging or casting been used, the accident would not have

occurred. Brynildson has not determined the load applications or tested the forces produced by the PC-5000. Defendant correctly notes that, as a result, he can not establish why steel components would have been adequate. Hence, he can not establish that but for the choice of ductile iron, Plaintiff would not have been injured.

Sholl's supplemental report includes more detail concerning the size and weight of the PC-5000. Based on these specifications, Sholl concluded that the PC-5000 "should have employed a U-joint series of the recommended size for a 50,000 lb. vehicle." It is not necessary at this time to determine whether this is an adequate conclusion to carry Plaintiffs' burden of causation. Defendant justifiably complains that both supplemental reports were compiled after Brynildson and Sholl had been deposed. Defendant is entitled to depose both of these experts once again concerning the additional opinions and data contained in their supplemental reports.

Moreover, Plaintiffs should bear the cost of these second depositions. Both supplemental reports responded to weaknesses in the original causation reports, that were revealed during both experts' depositions. Defendant should not bear the additional cost of deposing these experts a second time, because of Plaintiffs' decision to augment their reports. This is particularly so, given that neither initial preliminary report may have contained a legally adequate causation opinion. In addition, the Spicer literature on which Sholl's supplemental report relies, was available from the start. Therefore, Plaintiffs have no excuse for waiting until after the deposition to have Sholl incorporate this information.

The Court draws no conclusions at this time with respect to whether Brynildson or Sholl can actually demonstrate causation. It will hold Defendant's summary judgment motion in abeyance until Defendant has been able to depose Brynildson and Sholl once again. These

supplemental depositions should be taken no later than January 24, 2002.

**4. Failure to Warn.**

"A cause of action for failure to warn is separate from one for an allegedly defective product." Holowaty v. McDonald's Corp., 10 F.Supp.2d 1078, 1084 (D. Minn. 1998) citing Huber v. Niagra Mach. & Tool Works, 430 N.W.2d 465, 467 (Minn. 1988). Relevant factors to consider in determining if a warnings is adequate include:

1. The likelihood that harm would result from use of the product;
2. The seriousness of the harm that would result;
3. The cost and ease of providing warnings and instructions that would avoid the harm;
4. Whether the warnings or instructions are in a form the ordinary user could reasonably be expected to notice and understand;
5. Whether the manufacturer considered the scientific knowledge and advances in the field; and
6. Other factors.

Minnesota Practice, CIV. JIG 25.25.

"Although a manufacturer has a duty to warn of reasonably foreseeable dangers, there is no duty to warn if 'the user knows or should know of potential danger.'" Holowaty, 10 F.Supp.2d at 1084 quoting Minneapolis Soc. Of Fine Arts v. Parker-Klein Assoc. Architects, 354 N.W.2d 816, 821 (Minn. 1984), overruled on other grounds by Hapka v. Paquin Farms, 458 N.W.2d 693 (Minn. 1990). "Under Minnesota law, a manufacturer's failure to warn is not the cause of an accident or injury when the user was actually aware of the danger." Ramstad v. Lear Siegler

Diversified Holdings Corp., 836 F.Supp. 1511, 1516 (D. Minn. 1993) citing Balder v. Haley, 399 N.W.2d 77, 82 (Minn. 1987).

During his deposition, Plaintiff Kenneth Mielke made the following statements. He did not remember whether he read an operator's manual when he was first trained on a PC-5000. (Mielke Depo. 19.) He never reviewed any of the operator's manuals that were furnished when new PC-5000s were acquired. Id at 23. He had previously seen warning placards on PC-5000s. Id. at 25-26. He understood from the warnings he had read that there were safety reasons for staying on the operator's seat. Id. at 34. It was his own judgment, in spite of the warnings, that it was safe to operate the PC-5000 while walking next to it. Id. at 38. He was aware of the location and function of switches on the control panel, including an engine kill switch. Id. at 47. These switches were easily accessible to someone sitting in the operator's seat. Id. at 50.

Defendant states that Plaintiffs can not succeed with their failure to warn claim. Specifically, Defendant contends that Kenneth Mielke's admission that he never read the operation manual precludes any causal connection between the allegedly inadequate instructions and his injuries. Moreover, Plaintiff's admissions that he left the operator's platform despite being aware that he had been instructed to remain there for safety reasons, and that he was fully aware of how to shutdown the PC-5000 in the case of an emergency, demonstrate that additional warnings would not have changed his behavior.

Further, Defendant maintains that Plaintiffs can not succeed on a post-sale duty to warn claim. Defendant asserts that Plaintiffs have cited no evidence to support such a claim. Further, it contends that the flaws in Plaintiff's general failure to warn claim apply equally to the post-sale duty to warn claim. Consequently, Defendant concludes that the Court should grant summary

judgment on both of these failure to warn claims.

Plaintiffs respond that summary judgment is not appropriate on these claims. They cite Frey v. Montgomery Ward & Co., 258 N.W.2d 782 (Minn. 1977), for the proposition that "a duty to warn exists if the manufacturer knew or reasonably could have discovered the danger involved in the use of the product." They state that the operator's manual's warning concerning sudden backward lurching demonstrates that Defendant was aware of this possibly dangerous scenario. Moreover, Defendant has admitted that it was aware that operators of its product would regularly operate the PC-5000s while off the operator's platform. From these facts, Plaintiffs conclude that there are sufficient facts to support their failure to warn claims.

The Court grants summary judgment with respect to both failure to warn claims. The shortcoming of all of Plaintiffs' arguments is that they do not identify how further warnings could have prevented the accident. Plaintiff correctly notes that Defendant was aware of the PC-5000's potential to lurch backwards. But Plaintiff still has not demonstrated how superior warnings would have prevented this accident. The Eighth Circuit has stated that "an issue as to the adequacy of a warning necessarily presupposes that the operator has read the warning." Johnson v. Niagra Machine & Tool Works, 666 F.2d 1223, 1225 (8th Cir. 1981). In addition, Minnesota state courts have previously determined that summary judgment is proper when there is no evidence that a plaintiff relied on the warning. See J&W Enterprises, Inc. v. Economy Sales, Inc., 486 N.W.2d 179 (Minn. 1992). Moreover, Minnesota courts have refused to give jury instructions on a failure to warn claim, even when no warning was given, if there was no evidence that the presence of a warning would have caused a plaintiff to behave differently. Krein v. Raudobough, 406 N.W.2d 315 (Minn. Ct. App. 1987). These cases, as well as cases

such as Ramstad, emphasize that a duty to warn alone is not sufficient to support a failure to warn claim. Without some showing of causation, a failure to warn claim can not survive summary judgment. In the present case, Plaintiffs have produced no evidence to indicate that Plaintiff relied on the warnings that were given, or that different warnings would have changed his behavior. As a result, they have failed to satisfy the causation requirement. Consequently, summary judgment is appropriate.

Further, with respect to a post-sale duty to warn, Plaintiffs have failed to produce sufficient facts to support their claim.

> Under Minnesota products liability law, a continuing duty to warn of dangers associated with using a product arises on in 'special cases.' *Hodder v. Goodyear Tire and Rubber Co.*, 426 N.W.2d 826, 833 (Minn. 1988). The special circumstances in *Hodder* included: (1) the defendant's knowledge of problems with the product since the late 1950's, including the knowledge that the product might explode with little provocation; (2) the hidden nature of the danger; (3) the fact that when explosions did occur, serious injury or death usually resulted; (4) defendant remained in that line of business, continued to sell parts for use with the product and had advertised the product within five years of plaintiff's injury; and (5) defendant had undertaken a duty to warn of product dangers.

Ramstad, 836 F.Supp. At 1517. In the present case, there was no hidden nature to the danger involved. Instead, the original operator's manual and the employees who trained and supervised Plaintiff emphasized the danger, and the need to remain on the operator's platform. No additional dangers had developed between the time that the PC-5000 was manufactured, and the time of the accident. Consequently, it is unlikely that there was a post-sale duty to warn. More importantly, any post-sale duty to warn fails for the same reason the general duty to warn fails. Plaintiffs have failed to demonstrate that additional warnings would have prevented the accident.

Therefore, causation is also lacking in this claim. As a result, the Court grants Defendant's motion for summary judgment on both claims.

**THEREFORE, IT IS HEREBY ORDERED that:**

1. Defendant's Motion for Sanctions (Doc. No. 24) is **DENIED**;
2. Defendant's Motion for Summary Judgment (Doc. No. 24) is **GRANTED** with respect to all failure to warn claims;
3. Defendant's Motion for Summary Judgment (Doc. No. 24) is **HELD IN ABEYANCE** with respect to all defective design claims until the conclusion of the supplemental depositions of Plaintiffs' experts. At such time, the Court will permit limited additional briefing and argument on these issues alone.

Dated: January 14, 2002

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge